UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ROBERT L. IVEY, JR.,

                Plaintiff,

    vs.

CITY OF ROCHESTER and THE ROCHESTER
POLICE DEPARTMENT, JOHN WOICYK, JAMES
BREEN, JACK GEARY, ERIC WEIGEL, ELIUD
RODRIGUEZ, MARK ROHR AND JOHN DOE,

                Defendants.

**COMPLAINT
AND DEMAND
FOR A JURY TRIAL**

Case No. 21-cv-6752

---

The plaintiff, Robert Ivey, Jr., ("Robert"), currently incapacitated, by and through his natural parent, Robert Ivey, Sr., as and for a Verified Complaint against the defendants, the City of Rochester ("the City"), the Rochester Police Department ("RPD") and individual defendants John Woicyk, James Breen, Jack Geary, Eric Weigel, Eliud Rodriguez, Mark Rohr (herein referred to collectively as "the RPD Officers") and John Doe, allege as follows:

## PROCEDURAL BACKGROUND

1.    This action arises out of a false arrest, false imprisonment, malicious prosecution, abuse of process, assault and battery, negligent infliction of emotional distress, civil rights violations, injury and damages to the plaintiff caused by the defendants in the course of and following an arrest of Robert on September 26, 2020 at 73 Leo Street in the City of Rochester, New York.

2.    On April 28, 2021, Robert filed a Petition for Leave to Serve a Late Notice of Claim in the New York State Supreme Court, Monroe County.

3.    On July 2, 2021, an Order Granting Leave to Serve a Late Notice of Claim was issued by the New York State Supreme Court, Monroe County.

4.    On July 6, 2021, a Notice of Claim was served on the attorneys for defendants.

5.    On September 23, 2021, a Summons with Notice was filed in New York State Supreme Court, Monroe County.

6. On November 30, 2021, the Summons with Notice was served on defendants.

7. On December 20, 2021, defendants filed a Notice of Removal to the United States District Court for the Western District of New York.

8. On February 17, 2022, defendants served a Notice of Appearance and Demand for Complaint.

## VENUE AND JURISDICTION

9. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

10. This Court has supplemental jurisdiction over all other claims and parties not covered under Paragraph 9 above pursuant to 28 U.S.C. § 1367 in that said claims and parties are so related to the jurisdiction conferring claims that they form part of the same controversy.

11. The claims alleged in the Complaint all arise in the Western District of New York and venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

12. Robert demands a jury trial of his claims alleged in the Complaint pursuant to Federal Rules of Civil Procedure § 38(b).

## THE PARTIES

13. Robert, an incapacitated person, a resident of the City of Rochester at the time of arrest, now resides at Sunmount Developmental Center located in the Village of Tupper Lake, County of Franklin and State of New York.

14. The City is a municipal corporation duly existing under the laws of the State of New York and located in the Western District of New York.

15. The City is authorized to maintain the RPD, whose personnel act under color of law as agents of law enforcement for the City.

16. The City is within the jurisdiction of this Court.

17. Upon information and belief, at all relevant times herein, the RPD Officers, John Woicyk, James Breen, Jack Geery, Eric Weigel, Eliud Rodriguez, Mark Rohr and John Doe were and are employees of the City and RPD and residents of the State of New York.

18. This action is brought against officials of the City, RPD and the RPD

Officers in their individual capacity and in their official capacity as agents, servants or employees of the City and RPD.

## STATEMENT OF FACTS

19.    Upon information and belief, on or about September 26, 2020, at approximately 12:40 a.m., one or more of the RPD Officers were dispatched to 73 Leo Street in the City of Rochester in response to two (2) ShotSpotter Activations in the area, as well as two (2) subsequent ShotSpotter Activations on Joseph Avenue in the City of Rochester. While the RPD Officers were responding, video footage via the City camera located at Remington Street and Kohlman Street revealed two (2) males traveling on bicycles coming off of Remington Street and turning left onto Farbridge Street. Both males were stopped by one or more of the RPD Officers. One of the males, identified as Robert, was stopped on a bicycle on Zimbrich Street, west of Joseph Avenue.

20.    At said time and place, Robert was taken into custody by one or more of the RPD Officers, upon information and belief, with the pretext that the stopped Robert as he travelled down the street on his bicycle for violating the New York Vehicle and Traffic Law by riding his bicycle at night without a headlight.

21.    In the course of taking Robert into custody, the RPD Officers assaulted and battered Robert, applied chemical agents to his face and eyes and otherwise used excessive, unreasonable and unlawful force while taking Robert into custody.

22.    Robert is illiterate and mentally disabled.

23.    In custody, when the RPD Officers showed Robert some papers and tried to get him to sign them, he told them he could not read them and was unwilling to sign anything.

24.    Upon information and belief, the RPD Officers interpreted Robert's declination to sign documents that would be in the defendants' best interests for him to sign as a refusal to cooperate and mistreated him thereafter accordingly.

25.    For several hours, while in police custody and in obvious pain and distress, Robert complained of pain in his eyes and an inability to see as a result of chemical agents applied to his face and eyes during his arrest but the defendants denied him proper and adequate medical attention.

26.    The actions of the defendants constituted false arrest, false imprisonment, malicious prosecution, abuse of process, abuse of process of criminal proceedings, assault,

battery and the excessive use of force against a citizen of the United States and a deliberate denial of necessary medical attention, all as prohibited by the Fourth and Fourteenth Amendments of United States Constitution and Federal law.

27.     The damages and injuries sustained by Robert include physical injury to his eyes, head, bruises and abrasions, emotional distress and civil rights violations.

28.     Many of the improper actions of the RPD Officers are captured on video.

**AS AND FOR A FIRST CAUSE OF ACTION
AGAINST THE DEFENDANT RPD OFFICERS
FOR THE USE OF EXCESSIVE FORCE
IN VIOLATION OF 42 U.S.C § 1983**

29.     Robert repeats and re-alleges each of the allegations of each and every paragraph set forth above.

30.     At all times relevant to this Complaint, defendants were acting under color of law, that is, under color of the Constitutions, statutes, laws, regulations, customs and usages of the United States and the State of New York.

31.     While so acting under color of law, the RPD Officers engaged in an unjustified arrest of Robert.

32.     The RPD Officers physically assaulted and battered Robert, applied chemical agents to Robert's eyes and face and otherwise exercised excessive force in the course of taking Robert into custody.

33.     After falsely arresting and imprisoning Robert, the defendants maliciously prosecuted him by commencing a criminal proceeding against him.

34.     Said malicious prosecution of Robert has been forestalled by an Order of Hon. Charles A. Schiano, Jr. finding Robert to be an incapacitated person due to mental disease or defect, unable to understand the proceedings against him and incapable of assisting counsel in the criminal matter in his own defense.

35.     While in defendants' custody, the defendants denied and deprived Robert of proper and necessary medical care, with resulting harm and pain and suffering.

36.     As a result of their unlawful, malicious, reckless, and indifferent conduct, the RPD Officers acted under color of law but contrary to law and deprived Robert of his rights, privileges or immunities secured under the Constitution and laws of the United States and 42 U.S.C. §1983, including:

        a.     Robert's right to be free from an unreasonable seizure of his person,

as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution;

b.     Robert's right to be free from being assaulted, battered, pepper sprayed, handcuffed, unlawfully arrested and imprisoned without justification or probable cause to believe he had committed a crime

c.     Roberts right to be free from malicious prosecution;

d.     Robert's right to be free from an unreasonable seizure of his person, as guaranteed by Fourth and Fourteenth Amendments of the United States Constitution, by the use of unnecessary and excessive force against him; and

e.     Robert's right to proper medical care and attention while in custody.

37.     Defendants committed the foregoing violations of Robert's rights knowingly, intentionally, willfully, recklessly and/or with deliberate indifference to Robert's constitutional rights or to the effect of such misconduct upon Robert's constitutional rights.

38.     By reason of the foregoing, Robert demands judgment against said defendants in an amount to be determined at trial.

39.     As a further result of the intentional, malicious and reckless acts of the defendants, Robert is entitled to an award of punitive damages against said defendants in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE DEFENDANTS
## FOR FAILURE TO ADDRESS SERIOUS MEDICAL NEEDS
## IN VIOLATION OF 42 U.S.C § 1983

40.     Robert repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

41.     The City, RPD and the RPD Officers have acted under color of law to deprive Robert of his civil, constitutional and statutory rights to due process of law pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and are liable to Robert under 42 USC §1983.

42.     Recordings from cameras in the possession of the RPD and RPD Officers demonstrate that Robert was in great physical distress from the injuries sustained

during and after the arrest and from chemical agents applied by the RPD Officers to his face and eyes that required prompt medical treatment.

43.     Disregarding Robert's obvious need for medical treatment and the fact that he was expressing great pain and distress, the RPD Officers deprived him of timely medical treatment.

44.     Robert was not otherwise provided with an opportunity to receive proper medical attention.

45.     For an extended period of time at the location of arrest, while Robert sat handcuffed and in pain and distress, no ambulance ever arrived to address his serious medical needs.

46.     Upon information and belief, for an extended period of time after his arrest, the RPD Officers proceeded to drive Robert from the scene of the arrest to another location where no medical assistance was provided.

47.     The RPD Officers then drove Robert to RPD facilities in downtown Rochester where, upon information and belief, Robert was brought to a sink designated for washing chemicals from individuals who have been pepper sprayed – the equipment was non-functional and Robert's pain and distress continued.

48.     Robert was subjected thereafter to extensive questioning while essentially blinded from the chemical agents the RPD Officers had sprayed in his face and eyes and confined in an uncomfortably cold room, which added to his discomfort.

49.     Upon information and belief, following extensive questioning while in the custody of the RPD Officers, Robert was subsequently confined alone in a room for an extended period of time in which he fell asleep on an elevated surface, rolled off the elevated surface and struck his head with great force against the ground and suffered pain and injury.

50.     Upon information and belief, the RPD Officers knew, or should have known, Robert fell from the elevated surface, because the event is captured on their own recording equipment.

51.     The RPD Officers failed to provide timely medical care or assistance to Robert in connection with the injuries from his physical encounter with the RPD Officers and subsequent confinement as described above.

52.     Defendants committed the foregoing violations of Robert's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to

Robert's constitutional rights or to the effect of such misconduct upon Roberts constitutional rights.

53.     By reason of the foregoing, Robert demands judgment against said defendants in an amount to be determined at trial.

54.     By reason of the foregoing, as a result of the intentional, wanton and reckless actions of the defendants, Robert is entitled to an award of punitive damages against said defendants in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION
AGAINST THE DEFENDANTS THE CITY AND RPD
FOR MUNICIPAL LIABILITY UNDER *MONELL*
ARISING FROM A DELIBERATE INDIFFERENCE AND FAILURE
TO DISCIPLINE POLICE OFFICER WHO  USE EXCESSIVE FORCE
IN VIOLATION OF 42 U.S.C § 1983**

55.     Robert re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

56.     The City and RPD, by and through the actions and omissions of their leadership, including the Mayor of the City and the chiefs of police of RPD and others responsible to address such conditions, have deliberately and systemically failed to discipline RPD officers who use force without justification, even when it preserved for review on video.

57.     Upon information and belief, the need for said discipline is presently patently critical and obvious, as numerous RPD officers, including the defendant RPD Officers, have repeatedly used force without justification.

58.     The City and RPD, by and through the actions and omissions of persons in positions of leadership responsible to address such conditions, by failing to discipline RPD officers known to have used excessive force against arrestees on numerous occasions prior to September 26, 2020, resulted in the oft repeated unlawful use of force against Robert, because RPD officers know to a moral certainty there are no consequences for using excessive force in arrest situations. Many of these use of force incidents are captured on video but the City and RPD failed to impose any discipline on the officers.

59.     The failure of the City and RPD to maintain standards governing the imposition of discipline when RPD officers use force without justification, even when the force is captured on video, constitutes an unconstitutional municipal policy, practice and custom.

60.     By failing to discipline RPD officers who use force without justification—even when the unlawfulness of the force is observable by clear video evidence—the City and RPD have demonstrated a deliberate indifference to the constitutional deprivations caused by RPD officers' prolific use of unjustified force and failure to accurately document use-of-force incidents.

61.     The City and RPD have had actual and/or constructive knowledge of the pervasive and widespread practice of RPD officers' use of force without justification for many years, but has failed to take affirmative steps - like consistently disciplining officers who use excessive force with sincere intent to end the practice.

62.     Instead, the City and RPD have demonstrated a deliberate indifference to the pervasive and widespread use of excessive force among its officer by encouraging them to use force without justification by rewarding and promoting RPD officers who repeatedly use unjustified force.[1]

63.     While RPD has never undertaken any internal study of the use of excessive force by its officers and statistics on these practices are unavailable, there is extensive evidence of a longstanding practice by the City and RPD of refraining to discipline RPD officers who have used force without justification.

64.     Though no internal study of the use of excessive force by its officers has been conducted by the City or RPD and no reliable or accurate statistics on RPD officers' use of force are available, studies from other progressive jurisdictions where such data is collected show that, if officers who use excessive force go undisciplined thereafter, they are more likely to use excessive force again in the future.[1]

65.     Rather than implementing reforms designed to ensure that officers are disciplined for using excessive force and intended to discourage and prevent their

---

[1] *See,* Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13 WHAM (May 5, 2017), http://13wham.com/news/top-stories/rpd-officer-honored-in-midst-of-controversy; Todd Clausen, *City man hit by patrol car sues RPD, others for $7M*, DEMOCRAT & CHRONICLE (July 21, 2016), http://www.democratandchronicle.com/story/news/2016/07/21/rochester-ny-man-brian-a-norford-files-7-million-civil-suit-against-rochester-police/87382790/. Articles incorporated by reference herein.

The fact that the City and RPD deliberately fail to discipline RPD Officers who use excessive force in the course of effectuating arrests constitutes an unlawful municipal policy, which has created a culture within RPD where officers are permitted and encouraged to use excessive force during routine interactions with individuals in the City of Rochester, in violation of the Fourth Amendment to the United States Constitution.

subsequent use of force, the City and RPD have over time exhibited a deliberate indifference to the use of excessive force by sending RPD officers to be schooled in various *ex post facto* justifications for their unlawful use of force by Bill Lewinski, a self-proclaimed "police psychologist."[2]

66.     In a number of civil actions involving claims by victims of excessive force used against them by police, Mr. Lewinski has been precluded from testifying on behalf of defendant officers in federal courts because his testimony was unsupported by scientific foundation.[3]

67.     For example, Mr. Lewinski advocates a junk science known as anthropometry and has trained police officers to note the length of an arrestees' fingers in their official police paperwork as evidence of an individual's genetic predisposition for aggressiveness as a means to justify an officers' use of force.[4]

68.     Mr. Lewinski's opinions are so devoid of scientific basis and so deviates from common sense that when testifying at trial on behalf of defendant police

---

[2] See David Andreatta, *Rochester Police Department backpedals on controversial training*, DEMOCRAT & CHRONICLE (Sept. 6, 2017), http://www.democratandchronicle.com/story/news/local/columnists/andreatta/2017/09/06/roches ter-backpedals-controversial-police-training/639216001/; Transcript of Cross Examination of Bill Lewinski at 63-66, *Davidson* v. *Chicago*, No. 06-L-1577 (Sept. 24, 2009).

[3] See, e.g., *Miller v. City of Los Angeles,* Case No. Case 5:07-cv-00806-VAP-CT (C.D. Calif.), (the Court granted a motion *in limine* to exclude Lewinski's testimony "because his testimony lacks the requisite scientific foundation."); In *Tubar v. Clift,* CASE NO. C05-1154-JCC (W.D. Wash. 2009)(the Court limited Lewinski's testimony, recognizing that many of his proposed opinions were outside of his purported area of expertise); *White vs. Gerardot,* 2008 U.S. Dist. LEXIS 87761 (N.D. Ind. October 24, 2008) (limiting Lewinski's testimony because his proposedopinions lacked scientific foundation); *ADT Sec. Servs. v. Swenson,* 2011 U.S. Dist. LEXIS 28947 (D. Minn. 03/21/2011) (Court limited Lewinski's testimony and expressed concern about his proposed reenactment, reserving ruling until an evidentiary hearing outside the presence ofthe jury); *Lopez v. Chula Vista Police Department,* Case No. 07cv1272-WQH-BLM (S.D. Calif. February 18, 2010) (the Court likewise severely limited Lewinski's testimony and stated that he was not qualified to give the majority of the opinions (all but one) that he planned to give); *State of New Mexico* v. *Perez*, D-202-cr-2015-000105 (Aug. 24, 2015) (the Court precluded Mr. Lewinski from testifying regarding an officer's attention or memory in lethal force encounters, and from testifying regarding any officer's perception of what was occurring during the encounter at issue in that case, as such testimony "would be speculative rather than scientific").

[4] See David Andreatta, *Rochester Police Department backpedals on controversial training*, DEMOCRAT&CHRONICLE(Sept.6,2017),http://www.democratandchronicle.com/story/news/l ocal/columnists/andreatta/2017/09/06/rochester-backpedals-controversial-police-training/639216001/; Transcript of Cross Examination of Bill Lewinski at 63-66, *Davidson* v. *Chicago*, No. 06-L-1577 (Sept. 24, 2009).

officers in excessive force cases, a trial court judge and the jury audibly laughed at him.[5]

69.     The City and RPD have demonstrated their deliberate indifference to the pervasive and widespread use of force without justification by encouraging RPD officers to attend Mr. Lewinski's use-of-force training and his Force Science Institute, where the RPD officers learn various pseudoscientific techniques to avoid accountability for otherwise unlawful conduct, such as apologizing for the use of force against an individual based on anthropometry.

### THE CITY AND RPD HAVE AN OFFICIAL POLICY, PRACTICE AND CUSTOM OF FAILING TO DISCIPLINE OFFICERS WHO USE EXCESSIVE FORCE—EVEN WHEN SAID INCIDENTS ARE CAPTURED ON VIDEO

A.     The May 5, 2018 incident where RPD officers Spenser McAvoy and Michael Sippel   brutally beat Christopher Pate demonstrates RPD is infected with a culture of racism and that the City and RPD have failed to address systemic problems of racism and the use of excessive force.

70.     A May 5, 2018 incident involving Christopher Pate demonstrates that RPD is permeated with a disturbing elements and culture of racism infectious to all aspects of operation. Upon information and belief, the actions of the officers who used force against Mr. Pate were motivated by racial animosity, just like the actions of the defendant RPD officers in this case were motivated by racial animosity.

71.     The body camera footage of the incident showed that RPD officers Spenser McAvoy and Michael Sippel wrestled Pate to the ground and TASED him.

72.     Another piece of video shows McAvoy stating: "That's why I was asking for your ID but then when you want to be a smart a** then we're going to ding you for crossing the road illegally. That's it." McAvoy further states: "He's freaking so stupid. Everybody wants to think that the white cops are always after the black guy. Well, you [Pate] look like a guy on a wanted board."

73.     In fact, Pate looks nothing like the purported man on the wanted board, James Barrett, other than that they are both black men.

---

[5] *See, e.g.*, Cross Examination of Bill Lewinski at 63-66, *Davidson* v. *Chicago*, No. 06-L-1577 (Sept. 24, 2009) [transcript on file with Plaintiff's attorney].

74. On August 28, 2018, Mayor Lovely Warren of the City and RPD Chief Michael Ciminelli held a press conference to announce that they had suspended officers Spenser McAvoy and Michael Sippel for their unlawful stop, false arrest, assault, battery and use of excessive force against Pate during the May 5, 2018 incident.

75. Notably, Mayor Warren and the RPD Chief did not hold a press conference until after Pate's attorney filed the Notice of Claim informing the City of an intended lawsuit and after community activists held a press conference demanding justice for Mr. Pate.

76. Mayor Warren and Chief Ciminelli further announced that they would be seeking to terminate McAvoy and Sippel's employment with the City and RPD, and that the incident had been referred to the Monroe County District Attorney's Office ("District Attorney's office") for criminal prosecution.

77. Mayor Warren and Chief Ciminelli stated that video of the incident recorded by McAvoy and/or Sippel's body-worn camera(s) was the key evidence underlying their decision to seek their termination and to refer the incident to the District Attorney for possible criminal prosecution of the officers.

78. Mayor Warren stated that she had viewed the body worn camera recordings of the incident, and that "what [she] saw not only angered [her] and troubled [her], but hurt [her] in [her] heart."

79. Chief Ciminelli stated that the recordings from McAvoy and/or Sippel's body-worn camera(s) demonstrated that, "[t]his arrest should not have been made in the first place, and that triggered a sequence of events that is frankly outrageous."

80. The "outrageous" events include the officers falsely arresting Mr. Pate when the objective facts known to the officers unequivocally demonstrated a lack of reasonable or probable cause to believe Mr. Pate committed any criminal act or violation; TASERing him; placing handcuffs upon his wrists; repeatedly striking him in the face after he was handcuffed, causing occipital bone and jaw fractures and injuries to his mouth; and, making racist remarks and comments to and about Mr. Pate, all captured on the officers' body worn cameras.

81. Mayor Warren stated that since police officers hold positions of authority and wield power over citizens of the City, there is a heightened obligation to ensure that officers are held accountable when they commit misconduct and/or violate the

constitutional rights of the City's citizens.

82.     McAvoy and Sippel's excessive use of force, other unlawful actions and racist comments towards Mr. Pate was a direct and proximate result of the longstanding, entrenched policies and customs of the City and RPD in failing to discipline officers for using excessive force, even when said use of excessive force is preserved on video.

83.     At a press conference, Mayor Warren stated that prior to Mr. Pate's incident, other RPD officers had been suspended, fired, terminated, or forced to retire as a result of the City and RPD's investigation of citizen complaints that officers used excessive force against them.

84.     Upon information and belief, no RPD officer has been suspended, fired, terminated, or forced to retire as a result of the City and RPD's investigation of allegations that RPD officers used excessive force against them at any time during Mayor Warren's time in office as the Mayor of the City of Rochester.

85.     Upon information and belief, no RPD officer has been suspended, fired, terminated, or forced to retire as a result of the City and RPD's investigation of allegations that RPD officers used excessive force against them during Chief Ciminelli's appointment as the Chief of RPD.

86.     Upon information and belief, no RPD officer has been suspended, fired, terminated, or forced to retire in the past ten years as a result of allegations that said officer used excessive force.

87.     The failure of the City and RPD to address these underlying conditions after the Pate incident and others like it, but preferring to treat McAvoy and Sippel as scapegoats otherwise characterized as "bad apples", is a direct and proximate cause of Robert's injuries.

88.     Upon information and belief, the City and RPD continue to employ bad, racist cops who use excessive force against residents of the City of Rochester—and disproportionately against Black residents.

B. The September 4, 2015 incident where officers Jeffrey Kester, Matthew Drake and Steven Mitchell brutally beat David Vann while he was handcuffed and defenseless further shows that the City and RPD have failed to address systemic problems of racism and excessive force.

89.     On September 4, 2015, RPD Officers Jeffrey Kester, Matthew Drake

12

and Steven Mitchell brutally beat David Vann for over two minutes while he was handcuffed and not resisting or fighting with officers. Jeffrey Kester attempted to throw Mr. Vann onto the ground after he was handcuffed, as Mitchell and Drake pushed him from behind, causing Mitchell, Drake and Vann to fall on top of Kester. As a result of the actions of Kester, Mitchell and Drake, Kester broke his leg—when Mitchell and Drake realized Kester was injured, they retaliated against Mr. Vann by brutally beating him for over two minutes while handcuffed and defenseless. Videos of the incident are incorporated as if fully pleaded herein and can be viewed at the following URL: http://rochester.indymedia.org/node/147955.[6]

90.     Mitchell is a Defensive Tactic Instructor for RPD tasked with training recruits in arrest situations involving everything from handcuffing up through the escalation of force chart.

91.     Mitchell is also a Field Training Officer for RPD, a position involving hands–on–training of new officers in the field after they graduate from the police academy.

92.     As both the Defensive Tactics Instructor and a Field Training Officer for RPD, Mitchell is a municipal policymaker concerning RPD's use of force policies and training.

93.     Mitchell's use of force on Mr. Vann, handcuffed, helpless, not fighting, resisting or struggling with the officers in any way, is both grossly excessive under established law and criminal.

94.     Following this incident, Mitchell was not disciplined in any way.

95.     The City and RPD should have disciplined Mitchell because the video clearly evinces a use of force against Mr. Vann patently excessive and unlawful.

96.     Further, the City and RPD should have also disciplined Mitchell for false claims made in sworn police paperwork to support unjustified charges against Mr.

---

[6] The videos can be viewed by scrolling to the bottom of the page and clicking on the "play" buttons. Plaintiff fully incorporates the surveillance videos posted at http://rochester.indymedia.org/node/147955 by reference as if each fact depicted in said video was fully pled at length herein. Plaintiff does not incorporate by reference any information on thearticle posted at http://rochester.indymedia.org/node/147955 or any other information posted at that specific URL, or on the "rochester.indymedia" website.

Vann on two counts of felony assault on a police officer and then again in testimony before a grand jury and at Mr. Vann's criminal trial asserting that he and Kester could not secure handcuffs upon Mr. Vann's wrists—a position roundly contradicted by surveillance video.

97.     Following this Vann incident, Mitchell remained a Defensive Tactic Instructor and Field Training Officer for RPD.

98.     As a Defensive Tactic Instructor and Field Training Officer for RPD, Mitchell leads by example and instruct recruits and new officers how to make arrests, secure handcuffs onto an arrestee's wrists, when it is appropriate to use force against arrestees and the degree and kinds of force to exercise in different situations.

99.     Mitchell also teaches recruits and new officers how to complete their paperwork to document the reasons for making an arrest and using force against an arrestee.

100.     Choosing not to discipline Mitchell but keeping him the role Defensive Tactic Instructor, the City and RPD ratified his unlawful use of force against Mr. Vann as a municipal policy, practice or custom.

101.     Specifically, without disciplining Mitchell but maintaining him as a Defensive Tactic Instructor and Field Training Officer, the City and RPD in effect ratified as permissible the following conduct for RPD officers:

1.     Body-slamming a handcuffed, compliant, non-resisting arrestee onto the ground;
2.     Repeatedly punching a handcuffed, compliant, non-resisting arrestee when said arrestee is subdued on the ground and not posing a physical threat to the officer or others;
3.     Pepper spraying a handcuffed, compliant, non-resisting arrestee when said arrestee is subdued on the ground;
4.     Pepper spraying a handcuffed, compliant, non-resisting arrestee directly in the face from less than six inches;
5.     Fabricating accounts of interactions with arrestees in official RPD paperwork such as investigatory reports;
6.     Falsely swearing to the veracity of charging documents that falsely accuse arrestees of committing criminal acts and submitting the documents to prosecutors to initiate the malicious prosecution of said arrestees;
7.     Testifying falsely at grand jury proceedings;
8.     Testifying falsely at petit jury proceedings; and
9.     Signing false statements and testifying falsely despite knowing that objectivevideo evidence contradicts said false statements and testimony.

102.    The City and RPD also failed to discipline Kester or Drake for their false arrest or use of excessive force against Mr. Vann, for signing false felony complaints and testifying falsely in front of the grand jury and petit jury.

103.    By not disciplining Kester and Drake, the City and RPD ratified their conduct as a municipal policy, practice or custom.

104.    The City and RPD failed to conduct any internal investigation into Michell, Kester and Drake's use of force and/or failure to intervene to stop and or preventthe unlawful use of force against Mr. Vann to determine if their conduct was unlawful, excessive or in violation of RPD policies.

105.    The City and RPD knew or should have known of a need to investigate Michell, Drake and Kester's use of force and/or failure to intervene against its unlawful use upon Mr. Vann because Michell, Drake and Kester each acknowledge using force against Mr. Vann in their subject resistance reports; because Mr. Vann was acquitted by the jury; because the security camera video recovered from the store on the night of the incident unequivocally reveals the officers' fabrication of events concerning the mistreatment of Mr. Vann as described in arrest and charging paperwork and because they testified falsely at the grand jury and petit jury.

C. May 1, 2013 incident where RPD officers Joseph M Ferrigno II and Anthony R. Liberatore brutally beat Benny Warr, a disabled man in a wheelchair, further shows the department-wide problems of racism and deliberate indifference to officers' use of excessive force.

106.    On May 1, 2013, RPD officers Joseph M Ferrigno II ("Ferrigno") and Anthony R. Liberatore (Liberatore) were recorded by RPD Blue Light Cameras[7] and witnesses cell phone cameras[8] brutally beating Benny Warr, a 52-year-old African American man and wheelchair-bound amputee, while he was waiting for a RTS bus at

---

[7] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

[8] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.

the intersections of Jefferson and Bartlett Streets.[9] As reported by the Democrat & Chronicle, Mr. Warr testified to RPD's Professional Standards Section ("PSS") "that he was maced, thrown to the ground and struck after he responded to an order to move by telling officers that he was just waiting for a bus."[10] Mr. Warr's PSS testimony was corroborated by witness cell phone[11] videos and RPD Blue Light Camera video.[12]

107.    The PSS investigation found that Liberatore utilized an elbow strike to Benny Warr's head while Mr. Warr was lying face down on the ground, and determined that the elbow strike was an untrained technique under RPD standards.

108.    The PSS investigation also found that before Liberatore utilized the untrained elbow strike to Mr. Warr's head, he asked Mr. Warr: "Are you ready to get your ass kicked.?

109.    Liberatore testified to PSS that:

> He knew that he was under arrest. The only way he was going to leave was in an ambulance, meaning that we were definitely going to have to get physical and that either he was going to have to be hurt, or one of us were going to be hurt.

110.    Any reasonable person reviewing the PSS findings, Ferrigno's PSS testimony, and the videos of Ferrigno and Liberatore pepper-spraying Benny Warr, pushing his wheel chair over and repeatedly striking Mr. Warr in the head and body as he lay face down on the ground, must conclude the force used by Ferrigno and Liberatore is objectively unreasonable and excessive.

111.    Nevertheless, the PSS and Civilian Review Board ("CRB") each recommended to RPD Chief of Police James Sheppard that Ferrigno and Liberatore be exonerated on Benny Warr's allegations of excessive force used against him.

---

[9] *See* Complaint, *Warr, et al. v. City of Rochester, et. al.*, 13-cv-6508-DLG-MWP (W.D.N.Y. Sept. 19, 2013). Complaint incorporated by reference herein.

[10] Erica Bryant, *Whatever happened to Benny Warr*, DEMOCRAT & CHRONICLE (Dec. 7, 2013),http://www.democratandchronicle.com/story/news/local/2013/12/06/erica-bryant-what-ever-happened-to-benny- warr-/3895715/ (last visited Apr. 10, 2016). Article incorporated by reference herein.

[11] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.

[12] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

112.    According to the CRB, its main focus "is to determine the fairness, thoroughness and timeliness of the police complaint investigation as well as any possible deficiencies."[13] Moreover, the CRB prides itself in "providing independent, neutral fair representation for all involved parties."[14]

113.    However, in the CRB review of Benny Warr's excessive force complaint, the CRB panelists accused RPD of attempting to inappropriately influence their investigation. Specifically, the CRB panelists objected to the fact that Sergeant Andrew McPherson, one of RPD's Defensive Tactics Coordinators, made a presentation to the CRB explaining the purported reasons the PSS exonerated Ferrigno and Liberatore, despite the overwhelming video andtestimonial evidence showing they used excessive force in effectuating the arrest of Benny Warr.

114.    Former RPD Chief of Police James Sheppard reviewed the PSS and CRB investigative findings and the witness cell phone and RPD Blue Light Camera videos of the incident and decided to exonerate both officers on Mr. Warr's excessive force allegations because he believed the use of force was reasonable under the circumstances.

115.    Former Chief Sheppard was a municipal policymaker for the City and his decision not to discipline Ferrigno and Liberatore constituted a ratification of their unlawful use of force.

116.    Sheppard's choice not to discipline Ferrigno and Liberatore constituted an official policy of the City and RPD that RPD officers will not be disciplined for using excessive force even when their grossly excessive use of force is captured on video.

117.    The City recognizes the CRB and its use-of-force review procedures are constitutionally deficient and the City's steps toward overhauling itscivilian review process is an admission of that deficiency.[15]

118.    The proliferation of video evidence capturing police misconduct has led

---

[13] *Police Community Relations Program: Civilian Review Board 2015 Annual Report* at 15, available at http://www.cityofrochester.gov/WorkArea/DownloadAsset.aspx?id=8589964676 (last visited Apr. 17, 2016) (Hereinafter "2015 CRB Report"). 2015 CRB Report incorporated by reference herein.
[14] *Id.* at 3.

[15] Sharpe, Brian, *City Council seeks outside study of police civilian review process*, DEMOCRAT& CHRONICLE (June 3, 2017).http://www.democratandchronicle.com/story/news/2017/06/03/council-begins-review-bryant-case-seeks-outside-study-civilian-review-board/365336001/.Article incorporated by reference erenceherein.

to an increase in the number and percentage of substantiated complaints of police misconduct in municipalities across the country. For example, in New York City, the number of complaints substantiated by the NYPD's Civilian Complaint Review Board ("CCRB") increased approximately seventy-percent (70%) from 2014 to 2015.[16] In fact, forty-three percent (43%) of cases where video evidence was available were substantiated by the CCRB in 2015, as opposed to thirty-percent (30%) of cases substantiated overall.[17]

### THE CITY AND RPD'S DELIBERATE INDIFFERENCE IS REFLECTED IN A FAILURE TO DISCIPLINE OFFICERS WHO HAVE REPEATEDLY USED EXCESSIVE FORCE—EVEN WHEN SUCH CONDUCT IS CAPTURED ON VIDEO

119.    The City and RPD have been on notice of the widespread practice of officers' use of excessive force since at least 1992, when former RPD Chief Gordon F. Urlacher pleaded guilty to a felony conspiracy charge that he knew about civil rights abuses of five RPD officers, including the repeated use of excessive force, but deliberately failed to discipline the officers for their unlawful actions.[18]

120.    In recent years, with the proliferation of cell phone cameras, innumerable excessive force situations have been captured on video; nevertheless, even when video evidence exposes an officer's unreasonable use of force, the City and RPD refuse to discipline said officers.

121.    RPD administrative choice and policy against disciplining an officer use of unreasonable force, where warranted in the first instance, has the established impact of encouraging similar behavior by that officer in future encounters. The following examples represent a small fraction of instances where the officers are guilty of repeatedly using excessive force but face no disciplinary consequences, though their violations were captured on video.

### RPD OFFICER PATRICK GIANCORSO AND HIS RPD PARTNER WILLIAM WAGNER

---

[16] John Annese and Graham Rayman, *Review Board substantiates 30% of civilian complaints against NYPD officers in December with video evidence*, N.Y. Daily News (Jan. 15, 2016), http://www.nydailynews.com/new-york/30- civilian-complaints-nypd-substantiated-article-1.2497121 (last visited Apr. 10, 2016). Article incorporated herein by reference.
[17] *Id.*
[18] *Civil Rights Trial Is Likely to Leave a Long-Term Mark on Rochester Police*, N.Y. Times (Apr. 6, 1993), http://www.nytimes.com/1993/04/06/nyregion/civil-rights-trial-is-likely-to-leave- a-long-term-mark-on-rochester-police.html (last visited June 7, 2016). Article incorporated by reference herein.

122. RPD officer Patrick Giancursio ("Giancursio") has used excessive force against numerous individuals in the City of Rochester but has never been disciplined by the City or RPD.

123. Instead, it appears Giancursio has been rewarded by the City and RPD for his repeated use of unlawful force against various arrestees.

124. For example, RPD awarded Giancursio its "Officer of the Year Award" in May, 2017 though he was u n d e r suspension f r o m d u t y at the time of the award d u r i n g RPD's purported investigation of his use of force against Alexander Grassies in an April, 2017 incident captured on surveillance video.[19]

125. Giancursio was also seen on surveillance video using excessive force against Brian Norford in the area of 475 Lyell Avenue, Rochester, New York, on February 3, 2016, as Giancursio drove his RPD vehicle onto a sidewalk to purposefully strike Mr. Norford, knocking him to the ground. After knocking Mr. Norford to the ground with his police cruiser, Giancursio exited the vehicle and, in concert with his RPD partner, officer William Wagner, struck Mr. Norford several times.[20]

126. Despite Giancursio being observed on video using grossly excessive force at least t w i c e between February, 2016 and April, 2017, and the fact that he was suspended pending the RPD's investigation into his use of force against Mr. Grassies in April, 2017, RPD still chose to celebrate Giancursio with its "Officer of the Year Award."

127. Ignoring Giancursio's unlawful actions against Mr. Norford as captured on video, conduct costing the City tens of thousands of dollars in settlement of Mr. Norford's civil claims and garnering broad media attention, the City and RPD never conducted an independent investigation into Giancursio's use of force against Mr.

---

[19] Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13 WHAM (May 5, 2017), http://13wham.com/news/top-stories/RPD-officer-honored-in-midst-of-controversy. Article incorporated by reference herein.

[20] Todd Clausen, *City man hit by patrol car sues RPD, others for $7M*, DEMOCRAT & CHRONICLE (July 21, 2016), http://www.democratandchronicle.com/story/news/2016/07/21/rochester-ny-man-brian-a- norford-files-7-million-civil-suit-against-rochester-police/87382790/. Article incorporated by reference herein.

Norford to determine if it was unlawful, excessive or in violation of RPD policies.

128.    In fact, Giancursio's use of force against Mr. Norford was unlawful, excessive and violated RPD's policies.

129.    Nevertheless, the City and RPD never disciplined Giancursio for falsely arresting Mr. Norford or using excessive force against him.

130.    Giancursio's unlawful actions against Mr. Grassies were captured on video and generated widespread media attention, still the City and RPD failed to conduct an independent, full and fair investigation into Giancursio's use of force against Mr. Grassies to determine if it was unlawful, excessive or in violation of RPD policies.

131.    In fact, Giancursio's use of force against Mr. Garries was unlawful, excessive and violated RPD's policies.

132.    The City and RPD, however, simply accepted Giancursio and Wagner's justification for the use of force at face value.[21]

133.    Commenting on the suspensions of Giancursio and Wagner as a result of the incident involving Mr. Garries, RPD Chief Michael Ciminelli stated, "[w]e need to understand the justification for the use of force. Whenever an officer uses force, that officer has an obligation to articulate the justification for the force … why it was done, how it was done, did it follow our training, our policies."[22]

134.    Chief Ciminelli effectively acknowledges that, for the RPD, when evaluating the lawfulness of an officer's actions, the officers' *subjective* justification for the use-of- force is more important than *objective* evidence of an excessive use of force.

135.    The City and RPD eventually exonerated Giancursio and failed to impose any meaningful discipline against Giancursio following the April 2017 incident where he was captured on video using excessive force against Mr. Garries.

136.    Chief Ciminelli is a municipal policymaker for the City, and his decision not to discipline Giancursio constituted a ratification of his unlawful use of force.

137.    Chief Ciminelli's decision not to discipline Giancursio and instead affording him the honor of receiving the RPD "Officer of the Year Award" in May, 2017,

---

[21] 2 Rochester police officers suspended over incident on video, Democrat & Chronicle (Apr. 20,2017) https://www.usatoday.com/story/news/2017/04/20/2-rochester-police-officers- suspended/100703474/. Article incorporated by reference herein.

[22] *Id.*

constituted a continuation of the official policy of the City and RPD that RPD officers will not be disciplined for using excessive force even when undeniably excessive use of force is captured on video, a policy previously expressed in former Chief Sheppard's decision not to discipline Officers Ferrigno and Liberatore.

### RPD OFFICER RODRIGUEZ

138. RPD Officer Thomas Rodriguez ("Rodriguez") has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force or otherwise disciplined by the City or RPD.

139. On August 31, 2002, Rodriguez and other RPD officers attacked Lawrence Rogers at 375 Driving Park Avenue, Rochester, New York, by tackling him to the ground, TASERing him, punching, kicking, and beating him with night sticks. Upon information and belief, the excessive force used against Mr. Rogers by Rodriguez and other RPD officers, caused his death.

140. Rodriguez was never disciplined by the City or RPD following the incident on August 31, 2002 that caused Mr. Rogers' death.

141. Thereafter, on May 10, 2007, Rodriguez used excessive force against Ann Marie Sanders, a 100-pound woman, during an incident, where he grabbed her by the arms, body slammed her into the ground, put his knee in her back, handcuffed her, threw her into the back of a police vehicle, and threatened to mace her.

142. Rodriguez was never disciplined by the City or RPD following the May 10, 2007 incident with Ann Marie Sanders.

143. On August 7, 2016, Rodriguez engaged in the brutal beating of 17-year-old Ricky Bryant, wherein Mr. Bryant was shot with "pepper balls," punched in the face, thrown to the ground, sprayed in the face with mace and shot with a TASER.

144. As a result of the brutal beating at the hands of Rodriguez and other RPD officers, Mr. Bryant suffered serious physical injuries, including a fractured orbital socket.

145. Mr. Bryant filed a complaint with the CRB for excessive use of force by Rodriguez and other RPD officers who brutally beat him.

146. The CRB and RPD exonerated Rodriguez and other officers in Mr. Bryant's case.

147.     After the CRB and RPD exonerated Rodriguez and the other RPD officers involved in the brutal beating of Mr. Bryant, the Rochester City Counsel, for the first time ever, issued subpoenas for records related to the incident.

148.     The direct and proximate cause of Rodriguez's utilization of the illegal and excessive amount of force used against Mr. Bryant, resulting in a fractured orbital socket, was the City and RPD's failure to discipline Rodriguez after he previously used force without justification against Ms. Sanders, Mr. Rogers, and other individuals in the City of Rochester.

149.     Rodriguez's unlawful actions garnering national media attention but the City and RPD never conducted a full, thorough, fair and independent investigation into Rodriguez's use of force against Mr. Bryant, to determine if it was unlawful, excessive or in violation of RPD policies.

150.     The City and RPD never disciplined Rodriguez following the August7, 2016 incident in which he brutally beat 17-year-old Ricky Bryant and fractured his orbital socket.

151.     In April 2017, Rodriguez placed DKuan Webb in an illegal chokehold in an incident recorded on Rodriguez's body camera.

152.     Rodriguez's illegal chokehold of Mr. Webb was investigated by the Federal Bureau of Investigation, according to the Democrat & Chronicle.[23]

153.     In mid-July 2017, the City agreed to pay Mr. Webb $125,000 to settle any potential civil claims arising from the violation of Mr. Webb's rights under the United States Constitution and the common laws of the State of New York.

154.     The direct and proximate cause of Rodriguez's utilization of the illegal chokehold against Mr. Webb was the City and RPD's failure to discipline Rodriguez after he previously used force without justification against Ms. Sanders, Mr. Rogers, Mr. Bryant and other individuals in the City of Rochester.

155.     Rodriguez's unlawful actions were preserved on video, the City spent $125,000 settling Mr. Webb's civil claims, an FBI investigation into possible  federal criminal  and  or  civil  rights  violations  w a s   s t a r t e d and  t h e  c a s e  garnering

---

[23] Gary Craig, *City pays $125,000 to man allegedly choked by RPD police officer*, DEMOCRAT & CHRONICLE (Sept. 5, 2017), http://www.democratandchronicle.com/story/news/2017/09/05/city-rochester-police-choking-fbi-settlement-dkuan-webb-thomas-rodriguez-john- parrinello/632147001/. Article incorporated by reference herein.

22

national media attention but the City and RPD never conducted an independent investigation into Rodriguez's use of force against Mr. Webb to determine if it was unlawful, excessive or in violation of RPD policies.

156.     The City and RPD never disciplined Rodriguez following the April 2017 incident where he utilized an illegal chokehold against DKuan Webb.

### RPD OFFICER ALEXANDER BALDAUF (AND PARTNER RICKY HARRIS, JR.)

157.     RPD officer Alexander Baldauf ("Baldauf") has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the City or RPD.

158.     On August 17, 2013, Baldauf attacked Dwayne Ivery in Rochester, New York, punching Mr. Ivery in the head numerous times, slamming his body onto the ground, again punching Mr. Ivery in the head and body and stomping on Mr. Ivery's head with his foot. This incident was captured on video.

159.     Throughout the incident, upon information and belief, Baldauf's RPD partner, officer Ricky Harris, Jr. ("Harris"), stood idly nearby and failed to intervene to prevent or stop Baldauf's violation of Mr. Ivery's rights, despite having the time and opportunity to do so.

160.     Despite this interaction being caught on video, the City and RPD never conducted an independent investigation of the use of force by Baldauf or Harris' failure to intervene to determine if it was unlawful, excessive or in violation of RPD policies.

161.     Baldauf and Harris were never disciplined by the City or RPD following the incident with Mr. Ivery.

162.     On April 20, 2015, Baldauf used excessive force against Delmar Lipford during an incident at or near the intersection of Culver Road and East Main Street, Rochester, New York. Baldauf shoved Mr. Lipford in the back several times, punched him in the face, and pointed his TASER at Mr. Lipford.

163.     Throughout the incident, Baldauf's partner, Harris, stood idly nearby and failed to intervene to prevent or stop Baldauf's violation of Mr. Lipford's rights, despite having the time and realistic opportunity to do so.

164.     Baldauf and Harris were never disciplined by the City or RPD following the incident with Mr. Lipford.

### RPD OFFICER FERRIGNO

165.     Ferrigno has used excessive force against many individuals in the City of Rochester without reprimand, suspension, being retrained on the use of force or otherwise disciplined by the City or RPD.

166.     Although Ferrigno has been the subject of at least 23 civilian complaints of misconduct reviewed by RPD's Professional Standards Section ("PSS"), many of which involved allegations of excessive force, Ferrigno has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the City or RPD.

167.     On or about September 12, 2010, Ferrigno used excessive force against Robin Turner during an incident where she called 911 to report that she had been assaulted by a teenager in her neighborhood; Ferrigno responded but refused to file a police report and when Ms. Turner challenged Ferrigno's actions, he responded by s l a m m i n g   M s  T u r n e r ' s  body o nto the ground, dragging her across the ground approximately 10 feet and arresting her; as a result of the excessive force used by Ferrigno, Ms. Turner suffered a broken rib.

168.     Ms. Turner filed a complaint about the excessive amount of force used against her by Ferrigno during her arrest but, upon information and belief, the City and RPD never conducted an independent investigation of the use of force by Ferrigno to determine if it was unlawful, excessive or in violation of RPD policies.

169.     Ferrigno was never reprimanded, suspended, retrained on the use of force or otherwise disciplined by the City or RPD following his excessive use of force against Ms. Turner.

170.     On or about May 11, 2012, Ferrigno used excessive force against Darren Williams during an incident where Ferrigno hit Mr. Williams in the face while he was sitting down, threw him to the ground, punched and kicked him in his body and head, and stated to Mr. Williams: "Nigger, I'm going to teach you to respect authority."

171.     Despite Mr. Williams filing a complaint about the excessive amount of force used against him during his arrest, the City and RPD never conducted an independent investigation of the use of force by Ferrigno to determine if it was unlawful, excessive or in violation of RPD policies.

172.     Ferrigno was never reprimanded, suspended, retrained on the use of force or otherwise disciplined by the City or RPD following the incident where he used excessive force and racial slurs against Mr. Williams.

173.     On May 1, 2013, Ferrigno and his partner, RPD officer Anthony R.

24

Liberatore, brutally beat and falsely arrested Benny Warr. (see ¶106-110 et al above).

174.    RPD officers Ferrigno and Liberatore were never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the City or RPD following the May 1, 2013 incident where they brutally beat Benny Warr.

## RPD OFFICER MARIO MASIC

175.    RPD officer Mario Masic ("Masic") has used excessive force against numerous individuals in the City of Rochester both before and after the incident complained of herein, but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the City or RPD.

176.    Residents of Rochester who were repeatedly harassed, assaulted and subjected to excessive force by Masic sarcastically nicknamed him "the Cowboy" because of his wild and lawless behavior. Notably, upon information and belief, Masic has embraced the nickname, apparently referring to himself as "The Cowboy" during interactions with citizens in Rochester.

177.    Masic has used excessive force against other arrestees after the date of the incident complained of herein, including the use of force without justification against arrestees while they were handcuffed.

178.    Masic has never reprimanded, suspended, retrained on the use of force, retrained on the duty to intervene to prevent and/or stop unlawful actions of his fellow police officers, or been otherwise disciplined by the City or RPD following the incident(s) that occurred either before or after the incident complained of herein.

179.    On August 7, 2009, Masic unlawfully stopped, searched, arrested and used excessive force against a young man named Deshawn Keon Fields. Masic thereafter falsified his police paperwork in an attempt to justify the reasons that he stopped and arrested Mr. Fields, and then forwarded that falsified paperwork to the Monroe County District Attorney's Office. Thereafter, Masic perjured himself in front of the grand jury by tailoring his testimony in an attempt to nullify constitutional deficiencies in his arrest paperwork.

180.    Thereafter, in *People* v. *Fields*, Indictment No. 2009-0864 (Feb. 17, 2010), the Honorable Joseph D. Valentino granted the criminal defendant's motion to suppress because forensic evidence showed that Masic had testified untruthfully before the grand jury to nullify constitutional deficiencies in his arrest paperwork and justify the

initial unlawful stop and search of Mr. Fields. Judge Valentino also found Masic's testimony at the suppression hearing to be incredible and unbelievable.

181.    Masic violated NY CPL § 140.05 and RPD internal rules and regulations when he fabricated his arrest and charging paperwork in *Fields*.

182.    Masic violated RPD internal rules and regulations when he lied under oath to the grand jury and at the suppression hearing in *Fields*.

183.    After Judge Valentino granted the criminal defendant's motion to suppress in *Fields* based on his finding that Masic had lied in his arrest and charging paperwork and perjured himself on the stand, the City and RPD failed to discipline Masic.

184.    In choosing not to discipline Masic for his unlawful actions with Mr. Fields, the City and RPD effectively condoned his unlawful conduct, causing him to violate the rights of subsequent individuals.

185.    On May 12, 2011, Masic unlawfully entered the property of Emily Good and assaulted, battered and falsely arrested her in retaliation for her lawfully filming Masic while he conducted a vehicle search of an African American motorist who Masic had stopped directly in front of Ms. Good's home; Ms. Good filmed the encounter from her front yard and when Ms. Good refused Masic's request to stop filming, Masic entered her front yard, grabbed her phone from her hand, threw her to the ground, arrested her and charged her with disorderly conduct, obstruction of governmental administration and resisting arrest.

186.    Masic falsified his official arrest paperwork in an attempt to justify his unlawful arrest and use of force against Ms. Good, which he then forwarded to prosecutors to initiate her prosecution.

187.    All of the false criminal charges Masic initiated against Ms. Good were dismissed within a week after Masic falsely arrested her.

188.    Ms. Good filed a Notice of Claim against the City following the May 12, 2011 incident.

189.    The City settled Ms. Good's claim in exchange for her agreeing to forgo filing a civil rights lawsuit against the City and Masic.

190.    The video of Masic's violent exchange with Ms. Good went viral and drew national media attention but the City and RPD never conducted an independent investigation of Masic's use of force against Mr. Good to determine if it was unlawful,

excessive or in violation of RPD policies.

191. The City and RPD never reprimanded, suspended, retrained, or otherwise disciplined Masic for falsely arresting and using excessive force against Ms. Good.

192. On September 18, 2015, Masic arrested Quintin Keene in a laundromat on Genesee Street, Rochester, New York, and fabricated his arrest paperwork to falsely charge him with disorderly conduct, obstruction of governmental administration and resisting arrest. All criminal charges were eventually dismissed. In the course of arresting Mr. Keene, Masic pepper sprayed Mr. Keene, body-slammed him onto the ground and told Mr. Keene if he did not stop moving he was going to be shot.

193. Although Masic admitted using force against Mr. Keene and all the false criminal charges brought against Mr. Keene were eventually dismissed, Masic was never disciplined or reprimanded for his unlawful use of force against Mr. Keene.

## OTHER RECENT EXCESSIVE FORCE INCIDENTS CAPTURED ON VIDEO

194. On June 28, 2020, RPD Officers Nicholas Vandemar, Jeremy Lindauer and Brandon Contreras trespassed inside of the home of Tobias Massey where they assaulted, battered and falsely arrested Mr. Massey in response to him lawfully recording the officers forcibly arresting and sitting on the neck of a man in the front yard of his home. They arrested Mr. Massey and charged him with obstruction of governmental administration and resisting arrest. Then RPD Chief La'Ron Singletary admitted that, based on the officers' body cameras recordings and cell phone videos of the incident, the officers lacked any reason to arrest Mr. Massey, charge him with any crime or use any force against him.

195. On July 5, 2020, at approximately 2:00 a.m., RPD officers responded to a house on Pennsylvania Avenue following a 911 call reporting that a 16-year-old male was shot in the face and needed medical assistance. When RPD officers arrived at the location, they immediately assaulted and handcuffed two Black persons who were comforting the teen-ager and otherwise tending to his wounds. Coincidentally, several other individual were sitting in the back yard of a neighboring home when the police arrived. When a Ms. Martin and her friends heard the teen ager yell: "We called you for help and now you're abusing us," they approached the scene. When these

individual began recording the scene and demanding the release of the two individuals who were handcuffed, RPD retaliated against them by arresting four of them and charging them with obstruction of governmental administration.

196. On September 15, 2016, RPD officers were captured on video falsely arresting Lentorya Parker and violently throwing her to the ground.[24] The officers involved were never disciplined.

197. On August 27, 2013, RPD officers were captured on video assaulting a pregnant woman, Brenda Hardaway, punching her in the head and violently throwing her to the ground.[25] The officers involved were never disciplined.

198. The events of March 23, 2020 involve RPD officers and Daniel Prude wherein video evidence demonstrates their use of excessive force and mistreatment of Mr. Prude as alleged in the Complaint filed in this Court in the case of *Daniel Prude v. The City of Rochester, et al, Civil Action Number 20-cv-6675*, the facts of which are incorporated herein in further support of the claim RPD officers are inclined to employ unnecessary and unlawful force generally as a result of its repeated ratification as outlined above, especially against Black arrestees, as a municipal policy, practice and custom.

199. Often, RPD officers' unjustified use force is motivated by a desire to punish the arrestee for a perceived failure to display the degree of deference or compliance with unjustified demands made by the arresting officers and occurs without objectively reasonable cause. Officers' racist attitudes frequently play a role in their perception that an arrestee is not adequately responding to directives and an officer's decision to use force without justification.

200. Bad cops are the result of bad policy—and the City and RPD have for decades maintained an unlawful municipal policy, practice and custom of failing to discipline officers who use excessive force and then fabricate an account of events in

---

[24] Amy Hudak, *Body camera video released in Hollenbeck St. incident*, WHAM13 (Sept. 27, 2016), http://13wham.com/news/top-stories/body-camera-video-released-in-hollenbeck-st-incident; Amy Hudak, *Woman sues RPD, claiming excessive force in viral video*, WHAM13 (Sept. 6, 2017), http://13wham.com/news/local/woman-sues-rpd-claiming-excessive-force-in-viral-video. Articles and videos linked to therein are incorporated by reference hereto.

[25] Christine Carrie Fien, *Arrest video provokes outrage; chief responds*, CITY NEWSPAPER (Aug.28, 2013), https://www.rochestercitynewspaper.com/rochester/arrest-video-provokes-outrage-chief-responds/Content?oid=2265099. Articles and videos linked to therein are incorporated by reference herein.

arrest and charging paperwork to justify bringing one or more of a trinity of favored offenses to cover their sins of excessive force: disorderly conduct, resisting arrest, and obstruction of governmental administration.

201.     RPD officers commonly charge resisting arrest in conjunction with other charges when resolved to justify or conceal their unjustified use of force against the arrestee.

202.     The City and RPD's historic neglect to discipline officers has created an entrenched culture within RPD that condones and encourages officers to use excessive force as a matter of course, to lie in official police paperwork and sworn testimony to justify unlawful behavior and measures.

## UNCONSTITUTIONAL POLICIES AND PRACTICES RESULTED IN ROBERT'S INJURIES AND THE VIOLATION OF HIS CIVIL RIGHTS

203.     The City and RPD's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused Robert's constitutional rights to be violated as alleged herein.

204.     The City and RPD's practice of tolerating and condoning police misconduct by its officers, including the conduct of the RPD Officers in this case, directly and proximately resulted in the harm suffered by Robert as set forth herein.

205.     The City and RPD's policy, practice and custom of condoning the use of force without justification has caused countless individuals, including Robert, to be victimized by RPD officers repeatedly using of excessive force.

206.     The chief policymaking officials who have condoned these unconstitutional policies and practices are the Mayor of the City and former RPD chiefs who have failed to institute a system to ensure that excessive force incidents are properly investigated and that bad officers are held accountable. They have also failed to institute proper training to ensure that RPD officers are aware of the constitutional limitations on the use of force. These failures caused Robert's injuries.

207.     As a result of the above constitutionally impermissible conduct, decedent suffered violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, extreme physical pain, and death.

208.     Defendants committed the foregoing violations of Robert's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to

Robert's constitutional rights or to the effect of such misconduct upon Robert's constitutional rights.

209.     By reason of the foregoing, Robert suffered damages in an amount to be determined at trial.

210.     As a result of the intentional, wanton and reckless action of the defendants, Robert is entitled to an award of punitive damages against the defendants in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST THE DEFENDANT RPD OFFICERS
### FOR FALSE ARREST AND FALSE IMPRISONMENT

211.     Robert repeats and realleges each and every allegation of each and every paragraph above as if fully stated herein.

212.     On September 26, 2020, one or more of the RPD Officers, without just right or provocation, laid hold of Robert, handcuffed him, compelled him to enter the back of a marked police vehicle used for the transportation of criminals, all in plain view of numerous persons, and intentionally kept, detained and confined and/or imprisoned Robert for a period of time.

213.     Due to Robert's mental disease or defect, Robert lacked the capacity to understand why he was being placed under arrest and being confined.

214.     Robert was so confined and/or imprisoned against his consent.

215.     On September 26, 2020, one or more of the RPD Officers thereafter transported Robert in a marked police vehicle to various locations, including the Monroe County Jail, where Robert was further detained and confined for a period of time against his will without justification with the assistance of other police personnel.

216.     Upon information and belief, the RPD Officers took an active role in Robert's arrest and confinement, intending to confine and imprison Robert through the process of an unjustified arrest and detention against Robert's will.

217.     Upon information and belief, the defendants knew, or should have known, that Robert was suffering from a mental disease or defect and that he had committed no crime but still instigated the arrest with the intent that Robert would be unjustly arrested and confined and/or imprisoned for an alleged crime.

218. Upon information and belief, the RPD Officers acted recklessly in unison to instigate and direct the arrest and imprisonment of Robert who lacked the capacity to understand the proceedings against him.

219. During his incarceration and confinement at the Monroe County Jail, Robert was diagnosed with COVID 19 and thereafter deprived of proper and adequate medical care.

220. By Order of the Hon. Charles A. Schiano, Jr., New York State Supreme Court, Monroe County, dated February 24, 2021, it was determined, upon the examination of Robert by psychiatric examiners, that Robert lacked the capacity to understand the proceedings against him or to assist in his own defense, as a result of Robert's mental disease or defect.

221. Pursuant to the above Order, Robert was removed from the Monroe County Jail and committed to the custody of the New York State Office for People With Developmental Disabilities and placed in the Sunmount Developmental Center in Tupper Lake, New York where he remains to date away from family and otherwise confined.

222. As a result of the false arrest and false imprisonment of Robert, who lacked the capacity to understand the proceedings against him, Robert suffered physical and emotional harm.

223. By reason of the foregoing, Robert suffered damages in an amount to be determined at trial.

224. As a result of the intentional, wanton and reckless action of the defendants, Robert is entitled to an award of punitive damages against the defendants in an amount to be determined at trial.

### AND AS FOR A FIFTH CAUSE OF ACTION AGAINST THE DEFENDANT RPD OFFICERS FOR MALICIOUS PROSECUTION

225. Robert repeats and re-alleges each of the allegations of each and every paragraph set forth above.

226. The defendants' arrest of Robert led to criminal proceedings in Monroe County Supreme Court against Robert who was under indictment for a felony of Criminal Possession of a Weapon in the Second Degree, in violation of § 265.03 (3) of the Penal Law.

227. Upon information and belief, Robert is not guilty of the charges asserted against him.

228. Under Criminal Procedure Law § 730.50, criminal proceedings concluded with an Order signed by the Hon. Charles A. Schiano, Jr., dated February 24, 2021, which adjudicated Robert as an incapacitated person resulting in Robert being committed to the custody of the New York State Office of People With Developmental Disabilities in Tupper Lake, New York where he remains under confinement to date.

229. As a result of the malicious prosecution of Robert, who lacked the capacity to understand the proceedings against him, Robert suffered physical and emotional harm.

230. By reason of the foregoing, Robert suffered damages in an amount to be determined at trial.

231. As a result of the intentional, wanton and reckless action of the defendants, Robert is entitled to an award of punitive damages against the defendants in an amount to be determined at trial.

## AND AS FOR A SIXTH CAUSE OF ACTION
## AGAINST THE DEFENDANT RPD OFFICERS
## FOR ASSAULT

232. Robert repeats and re-alleges each of the allegations of each and every paragraph set forth above.

233. On September 26, 2020, the RPD Officers were acting individually and in their capacity as agents and employees of RPD and the City.

234. On September 26, 2020, during the course of his arrest, one or more of the RPD Officers intentionally and unnecessarily caused injury to Robert by physically assaulting Robert with pepper spray and otherwise exercised excessive force in the course of taking Robert into custody.

235. The RPD Officers intentionally assaulted Robert without justification.

236. Robert suffered great and permanent emotional distress and damages as a result of the assault.

237. By reason of the foregoing, Robert suffered damages in an amount to be determined at trial.

238. As a result of the intentional, wanton and reckless action of the defendants, Robert is entitled to an award of punitive damages against the defendants in an amount to be determined at trial.

## AND AS FOR A SEVENTH CAUSE OF ACTION
## AGAINST THE DEFENDANT RPD OFFICERS
## FOR BATTERY

239.   Robert repeats and re-alleges each of the allegations of each and every paragraph set forth above.

240.   On September 26, 2020, one or more of the RPD Officers intentionally touched Robert.

241.   Robert did not consent to the RPD Officers touching him.

242.   The RPD Officers' touching of Robert was offensive.

243.   The RPD Officers touched Robert for the purpose of harmfully and unnecessarily restraining Robert by applying pepper spray in Robert's eyes and otherwise exercised excessive force during the course of his arrest.

244.   The manner in which the RPD Officers touched Robert offended Robert's personal dignity.

245.   The manner in which the RPD Officers touched Robert was wrongful.

246.   The application of pepper spray in Robert's eyes by the RPD Officers was unjustified and excessive.

247.   The RPD Officers intentionally battered Robert.

248.   Robert suffered serious and permanent physical and emotional injury and damages as a result of the battery.

249.   By reason of the foregoing, Robert suffered damages in an amount to be determined at trial.

250.   As a result of the intentional, wanton and reckless action of the defendants, Robert is entitled to an award of punitive damages against the defendants in an amount to be determined at trial.

## AND AS FOR AN EIGHTH CAUSE OF ACTION
## AGAINST THE DEFENDANT RPD OFFICERS
## FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

251.   Robert repeats and re-alleges each of the allegations of each and every paragraph set forth above.

252.   The actions and conduct of the RPD Officers were done with disregard of a substantial probability their actions would result in severe emotional distress to Robert.

253. Robert has suffered from severe emotional distress from the careless policies and conduct of the defendants and, upon information and belief, will continue to do so into the future.

254. Robert suffered damages as a result of the intentional infliction of emotional distress.

255. By reason of the foregoing, Robert suffered damages in an amount to be determined at trial.

256. As a result of the intentional, wanton and reckless action of the defendants, Robert is entitled to an award of punitive damages against the defendants in an amount to be determined at trial.

## AND AS FOR A NINTH CAUSE OF ACTION
## FOR INJUNCTIVE RELIEF AGAINST
## THE DEFENDANTS THE CITY AND RPD

257. Robert repeats and re-alleges each of the allegations of each and every paragraph set forth above.

258. Robert demands injunctive relief in the form of an Order directing the City and RPD to implement new systems for investigating use-of-force incidents and disciplining officers that resort to the use of force without justification.

259. Accountability begins with access to reliable data and any remedy must include mechanisms to ensure the accurate tracking of use-of-force incidents, lawsuits, misconduct complaints and internal probes. Compilation of this data is the only way to find patterns to effectively: (1) root out bad officers, (2) amend or change RPD policy, and (3) identify issues that need to be addressed via additional training.

260. Because the City and RPD have persistently resisted calls for such reforms, Robert demands that any injunctive relief ordered by the Court to include independent oversight—such as by a Federal Monitor.

261. By reason of the foregoing, injunctive relief as proposed above is demanded.

**WHEREFORE,** plaintiff Robert L. Ivey, Jr. demands judgment against the defendants as follows:

A.   On the first cause of action against the defendant RPD Officers for the use of excessive force in violation of 42 U.S.C. § 1983, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

34

B.     On the second cause of action against the defendants for failure to address serious medical needs in violation of 42 U.S.C. § 1983, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

C.     On the third cause of action against the defendants the City and RPD for municipal liability under *Monell* arising from a deliberate indifference and failure to discipline police officers who use excessive force in violation of 42 U.S.C. § 1983, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

D.     On the fourth cause of action against the defendant RPD Officers for false arrest and false imprisonment, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

E.     On the fifth cause of action against the defendants for malicious prosecution, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

F.     On the sixth cause of action against the RPD Officers for assault, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

G.     On the seventh cause of action against the RPD Officers for battery, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

H.     On the eighth cause of action against the defendants for negligent infliction of emotional distress, judgment in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

I.     On the ninth cause of action for injunctive relief, an order directing the City and RPD to implement new systems for investigating use-of-force incidents and disciplining officers that resort to it without justification;

J.     Costs and disbursements in this action;

K.     Attorney's fees pursuant to statute; and

L.     Such other relief as the Court deems just.


Dated: April 9, 2022


                              s/Leo G. Finucane
                              Leo G. Finucane, Esq.
                              Finucane and Hartzell, LLP
                              *Attorneys for the Plaintiff*
                              *Robert L. Ivey, Jr.*
                              6 North Main Street
                              Pittsford, New York 14534
                              Telephone: (585) 586-0220
                              Leo@finucaneandhartzell.com


To:     Linda S. Kingsley
        Corporation Counsel
        John M. Campolieto, Esq., of Counsel
        *Attorneys for Defendants*
        *City of Rochester and The Rochester*
        *Police Department, John Woicyk,*

*James Breen, Jack Geary, Eric Weigel,*
*Eliud Rodriguez, Mark Rohr and John Doe*
30 Church Street, Room 400A
Rochester, New York 14614
Telephone: (585) 428-7410
John.campolieto@cityofrochester.gov

# VERIFICATION

STATE OF NEW YORK)
COUNTY OF MONROE  SS.:

**Robert L. Ivey, Sr.,** being duly sworn, deposes and says that he is the natural parent of the **Plaintiff, Robert L. Ivey, Jr.,** a mentally incapacitated individual; that he has read the foregoing Complaint herein and knows the contents thereof; that the same is true to the knowledge of deponent, except as to the matters therein stated to be alleged on information and belief, and as to those matters he believes them to be true.

Robert L. Ivey, Sr.

Sworn to before me this___
8 th.____ day of April, 2022.

Notary Public

STUART SOUSA
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01SO6408650
Qualified in Monroe County
My Commission Expires 09/08/2024